THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY CUNNINGHAM, Defendant-Appellant.

Second District    No. 2—92—1299

Opinion filed July 22, 1994.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Defendant, Timothy Cunningham, was charged with two counts of residential burglary (Ill. Rev. Stat. 1991, ch. 38, par. 19—3(a) (now 720 ILCS 5/19—3(a) (West 1992))). A jury acquitted him of the first count, residential burglary with the intent to commit a theft, but found him guilty of residential burglary with the intent to commit a criminal sexual assault. The trial court sentenced defendant to 15 years' imprisonment. Defendant appeals his conviction and raises the following issues: whether the State proved beyond a reasonable doubt that defendant had the intent to commit a sexual assault; and

whether an attached garage is part of a dwelling for purposes of residential burglary.

We summarize here only the essential facts. Defendant had been employed as a laborer by Robert K. In June 1991, Mary L. K., Robert's wife, began to receive phone calls in which the caller would hang up. In later calls, the caller spoke, and Mary recognized that it was defendant's voice. Defendant always called when Robert was not at home. Because of the calls, the Ks' made a police report and had a telephone trap placed on their phone on August 16 and 20, 1991. Mary kept a diary of the comments defendant made during the calls on those days; defendant made similar comments in calls made before and after August 16 and 20. The Ks' pressed charges against defendant for telephone harassment, and he admitted to making harassing calls. Between September 11, 1991, and March 13, 1992, defendant did not have access to a telephone.

Around 5 a.m. on May 13, 1992, Robert left his home to go on a business trip out of State. Mary and her five children, ages 7 months through 10 years old, were asleep. He drove only a short distance when he realized that he had forgotten some items at home. He returned to his house and entered the attached garage. He had been gone about 10 to 15 minutes. At the bottom of a stairway he discovered defendant standing at the door leading into the family room. Robert had not seen defendant in about a year, and he asked defendant what he was doing there. Defendant fled without answering. The police arrested defendant shortly thereafter. Neither Mary nor Robert had given defendant permission to be in the garage.

Later, Robert discovered a partially smoked, stamped-out cigarette on the third step. Neither he nor his wife smoked. He also found a large screwdriver on a ledge near the family room door. This screwdriver had been in the Ks' storage barn. The weatherstripping on the side door to the garage and the lock on that door had been damaged. The puncture marks on the weatherstripping matched the tip of the screwdriver found by the family room door.

Defendant first contends that the State failed to prove beyond a reasonable doubt that defendant committed residential burglary with the intent to commit a criminal sexual assault. Apparently, defendant concedes that his intent in committing the burglary was to engage in sexual intercourse with Mary; therefore, we focus our analysis on whether the evidence establishes, beyond a reasonable doubt, that defendant intended to use force.

A defendant's intent may be inferred from the character of his acts and the circumstances surrounding the commission of the offense. (*People v. Hopkins* (1992), 229 Ill. App. 3d 665, 672.) When

the facts give rise to more than one inference, the reviewing court may not substitute its judgment for that of the jury unless the jury's inference is inherently impossible or unreasonable. (*People v. Price* (1992), 225 Ill. App. 3d 1032, 1035.) It is the province of the jury to draw reasonable inferences from the evidence, and we may not overturn a finding of guilt unless the evidence is so unreasonable, improbable or unsatisfactory that there remains a reasonable doubt of defendant's guilt. (*People v. Stanciel* (1992), 153 Ill. 2d 218, 235.) We view all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 49.

Defendant argues that the evidence does not establish that when he entered the garage he intended to have sexual intercourse by force with Mary. He analogizes the facts here to those in *People v. Toolate* (1984), 101 Ill. 2d 301. In *Toolate*, the supreme court reversed a defendant's conviction of residential burglary with the intent to commit rape. The defendant entered the victim's home while she slept, formed an enclosure with furniture around one side of the bed, and "pulled on her left side." The court concluded that "[s]trange as Toolate's behavior was, the record contains no evidence whatever that he used force against or that he intended to have sexual intercourse" with the victim. *Toolate*, 101 Ill. 2d at 305.

Defendant's reliance on *Toolate* is misplaced. In *Toolate*, there was no evidence of the defendant's intent. Here, as noted above, defendant concedes that he intended to have sex with Mary; the only question is whether he intended to use force. The State presented such evidence in the form of the content and number of the harassing phone calls.

Defendant also relies on *People v. Matthews* (1976), 44 Ill. App. 3d 342. In *Matthews*, the defendant entered the victim's apartment in the afternoon, through an unlocked screen door. He sat across from her in her living room and said, " 'You are wearing your ring.' " (*Matthews*, 44 Ill. App. 3d at 343.) She ordered him to leave, and he responded, " 'I want to fuck you.' " (*Matthews*, 44 Ill. App. 3d at 343.) He then started walking toward the back of the house and suggested that she call the police. She went to a neighbor's apartment, called the police, and returned with the neighbor. The defendant was standing in the home, naked from the waist down. The appellate court reversed the defendant's conviction of burglary with the intent to rape because his statement and nakedness were not sufficient evidence that he intended to use force to have sex with the victim. In particular, the court noted that he did not threaten the victim or

attempt to prevent her from leaving, and it was in the middle of the afternoon. The court emphasized that "[h]is statement, although worded in the active and not in the subjunctive, does not, in itself, convey the impression that force was to have been a necessary ingredient of the proposed coupling." 44 Ill. App. 3d at 344.

We conclude that *Matthews* also is distinguishable. Here, according to Mary's diary of the calls on August 16, defendant made over 100 calls that day, and 70 of those calls were between 6:40 a.m. and 7:54 a.m., when she took the phone off the hook for a while. In some of these calls, defendant asked what Mary was wearing and whether she was alone. In addition, defendant made the following comments, some more than once: " 'I want your p---; Oh I'm c---; Why won't you talk to me? Don't you like sex? Oh, Mary stroke my c---; I want some of your t---.' " In particular, Mary recorded the following series of calls:

> "7:49 a.m. 'Mary, I want to f--- your a--.'
> 7:49 + seconds
> (didn't answer)
> 7:49 + seconds
> 'Let me see your a--.'
> 7:49 + seconds
> 'Mary, I want to make love to you in your a--.'
> 7:50 a.m. 'Mary, will you s--- my d---.'
> 7:51 a.m. 'Do you like to make love?'
> 7:51 a.m. + seconds 'I want your a---.' "

At 1:52 p.m., defendant asked " 'What are you, stuck up,' " and at 3:06 that afternoon, he told Mary, " 'I'm going to f--- your a--.' " Defendant made similar comments in calls throughout the day until 7:10 that evening. On August 20, defendant made 13 similar calls.

●1 Thus, the evidence showed that defendant subjected Mary to a barrage of obscene phone calls which clearly were unwelcome. In *Matthews*, the defendant's comment was an isolated remark. Here, defendant repeatedly made such comments to the point of being harassing. Although only the 3:06 call is worded as a threat, the jury could have found that defendant's conduct was meant as threatening and that Mary perceived it as such. (It appears from the record that Mary was so upset during her testimony that the court had to adjourn and resume her testimony after a break. The jury may have concluded that defendant knew that Mary was afraid of him.)

Furthermore, unlike in *Matthews*, defendant did not merely open an unlocked door; he forcibly broke in, and he did so at 5 a.m., a time when Mary was likely to be sleeping. (We question the *Matthews* court's assumption that entering a person's home during the

afternoon demonstrates no intent to commit a sexual assault. (See, *e.g., People v. Toliver* (1993), 251 Ill. App. 3d 1092.)) Also, in *Matthews,* there was no evidence that the defendant knew the victim would be unreceptive to his proposition. Here, the evidence that Mary had hung up on defendant and pressed charges against him supports the inference that defendant knew that Mary would not agree to have sex with him, as does defendant's admission that he made harassing telephone calls. Unlike the facts of *Matthews,* the evidence of the phone calls supports the inference that defendant intended to subject Mary to unwanted sexual contact.

In addition to the character of defendant's statements and conduct, the surrounding circumstances further distinguish the present cause. The screwdriver used to jimmy the door came from an outside shed, defendant had gained access to the garage and smoked a cigarette all within 10 to 15 minutes of Robert's leaving for a business trip, and defendant usually called when Robert was not home. These facts support the inferences that defendant knew Robert's work schedule; he was watching the house and waiting for Robert to leave before he broke in; and defendant wanted to enter the house when Robert was gone and Mary would be vulnerable. We conclude that a reasonable jury could have found from the phone calls and the circumstances surrounding the entry that defendant intended to engage in forcible sexual contact with Mary.

•2 Next, defendant contends that, under Illinois law, an attached garage is not part of a dwelling for purposes of residential burglary. Therefore, defendant reasons, his conviction must be reversed.

A person commits residential burglary when he "knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." (Ill. Rev. Stat. 1991, ch. 38, par. 19—3(a) (now 720 ILCS 5/19—3(a) (West 1992)).) "For the purposes of Section 19—3 ***, 'dwelling' means a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside." (Ill. Rev. Stat. 1991, ch. 38, par. 2—6(b) (now 720 ILCS 5/2—6(b) (West 1992)).) Defendant relies on *People v. Mata* (1993), 243 Ill. App. 3d 365, 368, which held that a garage, whether attached or not, "cannot be deemed a residence or living quarters." See also *People v. Smith* (1991), 209 Ill. App. 3d 1091, 1095 (court stated in *dicta* that an attached garage used for storage is not a dwelling).

*Mata* derived this proposition from the supreme court's opinion in *People v. Thomas* (1990), 137 Ill. 2d 500. However, *Mata's* holding is based on a misinterpretation of *Thomas.* (*People v. Silva* (1993),

256 Ill. App. 3d 414, 421.) We agree with *Silva* that "*Thomas* did not hold that a garage *per se* is not a dwelling within the meaning of the residential burglary statute." (*Silva*, 256 Ill. App. 3d at 421; see also *People v. Donoho* (1993), 245 Ill. App. 3d 938, 942 (this court declined to answer whether, as a matter of law, an attached garage is part of a house for purposes of the residential burglary statute).) On the contrary, *Thomas'* reasoning is almost diametrically opposed to the holding of *Mata*.

In *Thomas*, the court considered whether the defendant was properly charged with burglary, rather than residential burglary. The victim's body was found in the attached garage of a multiunit structure. The victim stored perfume products in the garage. *Thomas* held "that an attached garage is not necessarily a 'dwelling' within the meaning of the residential burglary statute," and under the facts at issue, the garage could not be deemed a residence or living quarters. *Thomas*, 137 Ill. 2d at 519.

The decision in *Thomas* was premised on the definition of "dwelling" in section 2—6(b) of the Criminal Code of 1961 and *People v. Bales* (1985), 108 Ill. 2d 182, which first set forth that definition. (*Thomas*, 137 Ill. 2d at 519.) *Bales* stated that whether a structure is a "dwelling" depends on how it is used, rather than on the nature of it. (*People v. Bales* (1985), 108 Ill. 2d 182, 190.) In setting forth the definition of "dwelling," the *Bales* court explained, "the legislature, in the residential-burglary statute, attempted to restore to this crime the original status of the crime of burglary—an offense against a particular type of structure or enclosure, that is, a structure or enclosure which is used for habitation purposes, and to make residential burglary a more serious offense than the ordinary illegal invasion of other types of structures or enclosures." (*Bales*, 108 Ill. 2d at 191.) The purpose of the residential burglary statute is to deter the unlawful entry into dwellings and thereby protect the privacy and sanctity of the home. 108 Ill. 2d at 193.

The supreme court in *Thomas* further stated that its decision was not "necessarily inconsistent with the reasoning" of *People v. Dawson* (1983), 116 Ill. App. 3d 672, which held that the entry into an attached garage constitutes residential burglary. (*Thomas*, 137 Ill. 2d at 520.) *Dawson* reasoned that because the house and the garage were attached with one roof, one foundation, and a connecting door, once the defendant had broken the close of the garage, he had entered the dwelling. (*Dawson*, 116 Ill. App. 3d at 675.) In light of *Bales* and *Dawson*, we perceive that what the supreme court in *Thomas* meant was that ordinarily an attached garage is a "dwelling" because it is part of the structure in which the owner or occupant lives.

*Thomas* set forth an exception to that general rule where the garage was one of several that was part of one structure with multiple dwelling units. Had the court not made this distinction, the entry into the one garage would constitute residential burglary to every unit in that building, even if none of the units were directly connected to that garage. The *Thomas* court's reference to the holding of *Dawson* and its reliance on *Bales* indicates its acceptance of the reasoning of *Dawson* and *Bales* and shows that the court did not intend to abrogate the general rule. Thus, we decline to follow *Mata* and the *dicta* of *Smith*, and instead we conclude that an attached garage of a single-family home, which leads directly into a room of the house, is a part of the dwelling for purposes of the residential burglary statute, and the State need not prove that anyone was actually "living" in the garage.

The evidence here established that defendant entered an attached garage of a single-family home. There was a door in the garage leading directly into the family room. The side door to the garage was locked. The garage was used primarily to store tools and the children's bicycles and toys, and the children used the garage daily. From the photographs introduced into evidence, it appears that there was no room to park cars in the garage. We conclude that, under these facts, the jury could find beyond a reasonable doubt that the Ks' garage was part of their dwelling for purposes of the residential burglary statute. See *People v. McIntyre* (1991), 218 Ill. App. 3d 479, 482 (facts established that screened-in porch was part of the living quarters of the house).

We therefore affirm defendant's conviction of residential burglary.

Affirmed.

WOODWARD and GEIGER, JJ., concur.