# Illinois Official Reports

## Appellate Court

---

### *People v. Ramsey*, 2018 IL App (2d) 151071

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RUNALDO D. RAMSEY, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-1071 |
| Filed | June 12, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-CF-1197; the Hon. Robert G. Kleeman, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Kristin M. Schwind, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant, Runaldo D. Ramsey, appeals his convictions and sentences for Class X home invasion (720 ILCS 5/12-11(a)(2), (c) (West 2010)) and two counts of Class 3 aggravated battery (*id.* § 12-3.05(a)(1), (f)(1), (h)). He contends that the evidence was insufficient to prove him guilty of home invasion beyond a reasonable doubt, that he was denied his right to counsel of his choice, and that he was wrongly sentenced to an extended term for aggravated battery. We affirm the convictions but modify the sentence for aggravated battery.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was indicted in July 2012 and released on bond. Early on, his attorney sought to withdraw, stating that he had not spoken to defendant for a while and had tried to call him. Defendant then appeared in court late and told the court that he had hired new counsel. He was given a two-week continuance. In June 2013, his counsel withdrew, and the public defender was appointed. In July 2013, defendant failed to appear at a status hearing, and it was noted that he had previously been late for hearings. After further continuances, the case was set for a jury trial on July 29, 2014. On July 24, 2014, attorney Ted Gailan sought to file an appearance, but the court denied the request because defendant failed to appear and trial was already set. On July 29, 2014, trial was continued because the court had a scheduling conflict, and defendant was allowed to seek to retain substitute counsel. However, defendant did not do so. After several more continuances, trial was set for August 24, 2015. During that time, defendant failed to appear at least once.

¶ 4     On August 24, 2015, defendant waived a jury trial, and the case was held over to the next day for a bench trial. The next day, defendant's public defender told the court that defendant wanted a private attorney, "Mr. Kayne," to represent him. The public defender stated that Kayne informed him that he would be unable to go to trial that day, that it was unlikely that the court would grant a continuance, but that, if the court did so, Kayne could go to trial in two weeks. The State objected, arguing that the request was a dilatory tactic, and the public defender replied that Kayne said without reservation that he was willing and able to come into the case. The court denied the request, stating that its ruling would have been different if made a week earlier but that it was now "59 minutes past the eleventh hour," there were witnesses in the hallway, and the court would not inconvenience the witnesses and the State.

¶ 5     Trial began, and after a recess defendant appeared 54 minutes late and was admonished that, if he were late again, a warrant would issue. The court then revisited the issue of defendant's request to substitute counsel, stating that it wanted to clarify the matter for the record. The court had since reviewed a case on the issue and provided it to counsel. Defense counsel and the State both made brief statements. The State noted that defendant had previously retained multiple attorneys, and it argued that defendant was trying to delay trial. The court observed that defendant had been represented by several different attorneys and that the case had been continued due to a scheduling conflict that gave defendant additional time to retain private counsel, but none was retained. The court also found that the public defender had been on the case for some time and that Kayne was not ready to make an unconditional appearance. The court indicated that it was perhaps having different thoughts on whether defendant subjectively was trying to delay trial but that, even if defendant did not

subjectively intend to be dilatory, granting a continuance on the day of trial would unduly interfere with the administration of justice.

¶ 6    At trial, Steven Stanley testified that, on June 8, 2012, he lived in a building with two apartments. Stanley lived on the first floor, and his landlord lived on the second floor. Stanley was required to enter his apartment through the back door of the building, which opened into a laundry room. From there, a door opened into Stanley's apartment. Another door led to a set of stairs leading to his landlord's apartment. Other than passing through to his apartment, Stanley was not allowed to use the laundry room. He was not allowed to wash his clothes there and would not leave boots or an umbrella there. When asked if his living area started when he set foot inside of the exterior door, Stanley said "[n]o." When asked if he was allowed to keep other people out of the laundry room, he replied, "[i]f the outside door is locked, yes," but "[i]f the door is open, they are going to walk in." He then agreed that, whether the door was locked or not, he had a right to tell people that they could not come in. He later stated that he used the laundry room only as a hallway to enter his apartment. Multiple times during trial, Stanley referred to the interior door that opened to his apartment from the laundry room as his back door. However, he also referred to the exterior door as the back door on several occasions.

¶ 7    On June 28, 2012, between 11:30 p.m. and midnight, defendant and his girlfriend, Tuwanda, came to Stanley's apartment and banged on the window. Stanley's ex-girlfriend, Colleen, was Tuwanda's friend, and Stanley had previously met defendant. Stanley let defendant and Tuwanda inside. Tuwanda then said that she would wait in the car and left. Defendant asked Stanley if he had defendant's money. Stanley said that he did not owe defendant money. Defendant repeated his request and said that Colleen owed him $50 and that Stanley was her "money man." Defendant continued to repeat that he wanted his money, and Stanley reached into his wallet and gave defendant $20, telling him that that was all he had. Defendant persisted in asking for money, appeared agitated, and spit in Stanley's face. Stanley then gently pushed defendant, and defendant pushed him back, causing him to fly across the kitchen and hit his head on the kitchen cabinet. When Stanley got up, defendant hit him on the ear with a beer bottle.

¶ 8    Stanley said that he was calling the police and ran to the bedroom for his phone. As he was dialing, defendant tackled him into a television and began strangling him. Stanley hit defendant in the ribs, and defendant let him go and left the bedroom. Stanley picked up his phone, which in the scuffle had gotten about 20 numbers entered on it. He began erasing the numbers so that he could dial 911. He also entered his kitchen to lock the interior door. As he approached the door, defendant entered with a garden weeder in his hand. Defendant tried to stab Stanley in the face and chest with the weeder, and its handle split down the middle. Defendant then left the apartment again and returned with a second, "much sharper" garden weeder with a "V-shaped blade." Using the weeder, defendant stabbed Stanley multiple times and told Stanley that he was a dead man if he called the police. Defendant then left. The weeders had been stored outside the building, next to the exterior door. Exhibit No. 27 shows a weeder leaning against the building, within an arm's reach of the door. A person likely could retrieve it without fully exiting the building.

¶ 9    Stanley called 911 and went to the hospital, where he was treated for multiple injuries. Stanley identified defendant from a photo lineup. The investigating officer testified at trial about the crime scene and took the picture in exhibit No. 27. During closing arguments, the

State suggested that defendant must have left the weeder in that position when he went outside and got the second weeder.

¶ 10 The defense moved for a directed finding, arguing that the State failed to prove the offense of home invasion because the laundry room was part of Stanley's dwelling and the State failed to prove that defendant exited and reentered after his initial authorized entry. The court denied the motion, noting circumstantial evidence that defendant left the building entirely and noting that the laundry room was a common area. The defense rested without providing evidence.

¶ 11 The court found defendant guilty, finding that, based on exhibit No. 27, it was persuaded beyond a reasonable doubt that defendant twice left the building in its entirety through the outside door, recovered a weapon, and made an unauthorized entry back into the building. Thus, the court stated that it found an unauthorized entry "regardless of the analysis about the common area[,] which I stand by."

¶ 12 The two aggravated-battery convictions merged into one for sentencing. The court sentenced defendant to 17 years' incarceration for home invasion and a concurrent 7-year extended term for aggravated battery. Defendant's motion to reduce the sentence was denied, and he appeals.

¶ 13                                II. ANALYSIS

¶ 14 Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt of home invasion because it failed to prove an unauthorized entry into Stanley's dwelling. He argues that the laundry room was part of the dwelling and that the State failed to prove beyond a reasonable doubt that he completely left the building to get the weeders and then reentered without authorization. The State argues that the laundry room was not part of Stanley's dwelling and that, in any event, there was sufficient evidence that defendant entirely left the building.

¶ 15 A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 16 A defendant who is not a peace officer commits home invasion when, without authority, he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons are present and intentionally causes any injury to any person within the dwelling. 720 ILCS 5/12-11(a)(2) (West 2010). A "dwelling" is defined as "a building or portion thereof, a tent, a vehicle, or other enclosed space which is used or intended for use as a human habitation, home or residence." *Id.* § 2-6(a).

- 4 -

¶ 17        There is little case law addressing when a common area such as the laundry room in this case is part of a dwelling for purposes of proving home invasion. In *People v. Pavic*, 104 Ill. App. 3d 436, 447 (1982), the First District stated in *dicta* that the basement of an apartment building was part of the victims' dwelling. There, the defendant followed the victims home and tampered with a circuit breaker in the basement of their building. When the victims left to turn the electricity back on, the defendant entered their apartment and raped them upon their return. In affirming the defendant's conviction of home invasion, the court noted that, although apartment dwellers live in their apartments, they necessarily use other portions of the building such as to get to and from their apartments or to do laundry. *Id.* The court ultimately stated, though, that it need not conclude that the basement was part of the dwelling, because the victims' constructive presence in the apartment was sufficient. *Id.* However, our supreme court overruled *Pavic* in *People v. Pettit*, 101 Ill. 2d 309 (1984).

¶ 18        In *People v. Pettit*, 114 Ill. App. 3d 876 (1983), the defendants invaded a first-floor apartment but later moved the victims to an empty second-floor apartment. The defendants were charged with home invasion only in connection with their entry into the second-floor apartment. We reversed the defendants' convictions because the victims were not present in the second-floor apartment when the defendants invaded it, noting that the purpose of the home-invasion statute is solely to protect the personal safety of people in their homes. *Id.* at 881. Our supreme court affirmed. *Pettit*, 101 Ill. 2d at 315. In doing so, the court discussed *Pavic* and referred to the apartment in *Pavic* as the victims' " 'dwelling.' " *Id.* at 313. The court noted that the *Pavic* court ruled that the basement of the apartment building was also part of the victims' dwelling. The court then stated, "We do not agree with this interpretation, and we hold that the statute requires the physical presence of one or more persons in the dwelling to constitute a home invasion. To the extent this opinion is inconsistent with the interpretation in *Pavic* we now overrule it." *Id.*

¶ 19        Whether a common area is part of a dwelling has also been discussed in various burglary cases. See, *e.g.*, *People v. Silva*, 256 Ill. App. 3d 414, 421 (1993) (unoccupied basement and apartment used for storage in a two-flat constituted a dwelling); *People v. McIntyre*, 218 Ill. App. 3d 479, 481-82 (1991) (attached, enclosed porch part of the dwelling). Also in regard to burglary, in *People v. Thomas*, 137 Ill. 2d 500, 519-20 (1990), our supreme court held that a garage attached to a multiunit dwelling was not part of the victim's dwelling. We later interpreted *Thomas* to mean that normally an attached garage is part of the dwelling because it is part of the structure in which the owner lives. Under *Thomas*, however, an exception applies when the garage is attached to a multiunit dwelling, because, without that distinction, the entry into the garage would constitute a burglary to every unit in the building. *People v. Cunningham*, 265 Ill. App. 3d 3, 9 (1994).

¶ 20        Although defendant relies on a number of burglary cases, the cases he relies on focus on single-unit dwellings or on areas actively being used by the victims. This case, however, involves a common area of a multiunit dwelling, which defendant used only to pass through. We also note that the crime of burglary uses a definition of "dwelling" that includes "a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside." 720 ILCS 5/2-6(b) (West 2010). Here, our focus is on whether the victim used or intended to use the location as a human habitation, home, or

residence. *Id.* § 2-6(a). We conclude that, in this case, there was sufficient evidence that the laundry room was not used by Stanley in such a manner.

¶ 21    Other than passing through to enter his apartment, Stanley was not allowed to use the laundry room. He was not allowed to wash his clothes there and would not leave boots or an umbrella there. When asked if his living area started when he set foot inside the exterior door, Stanley said "[n]o." Although he admitted that he had the right to tell people not to enter, he also stated that he used the laundry room only as a hallway to enter his apartment. He also referred to the interior door that opened to his apartment from the laundry room as his back door, albeit inconsistently. Despite the inconsistencies, we find that there was sufficient evidence for the trial court to infer that Stanley did not use the location as part of his habitation, home, or residence. Instead, it was a common area that he merely passed to reach his apartment, which was his actual dwelling. See *Pettit*, 101 Ill. 2d at 313. As a result, when defendant left Stanley's apartment, he exited the dwelling and then returned unauthorized, making him guilty of home invasion. Because we determine that the laundry room was not part of the dwelling, we need not decide whether there was sufficient evidence that defendant left the building entirely.

¶ 22    Defendant next argues that he was denied his right to counsel of his choice when the trial court denied his motion to continue in order to substitute counsel.

¶ 23    A defendant has a constitutional right to the assistance of counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8), which includes the right to counsel of his choice. *People v. Friedman*, 79 Ill. 2d 341, 349 (1980). A defendant may not, however, wield this right "as a weapon" to "thwart the administration of justice or to otherwise embarrass the effective prosecution of crime." *Id.* In ruling on a defendant's request for a continuance for substitution of counsel, the trial court must balance "the fundamental right of the defendant to counsel of his choice [citations], against the interests of the State, the courts and the witnesses in the efficient disposition of cases without unreasonable delay [citations]." *People v. Little*, 207 Ill. App. 3d 720, 723-24 (1990). Whether to allow a continuance for a defendant to retain new counsel is a matter left to the trial court's discretion, and we will not overturn its decision absent an abuse of that discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000); *People v. Curry*, 2013 IL App (4th) 120724, ¶ 49.

¶ 24    " 'In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic.' " *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008) (quoting *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992)). "Factors to be considered include: whether defendant articulates an acceptable reason for desiring new counsel; whether the defendant has continuously been in custody; whether he has informed the trial court of his efforts to obtain counsel; whether he has cooperated with current counsel; and the length of time defendant has been represented by current counsel." *Id.* "[W]hen a defendant cannot 'articulate an acceptable reason for desiring new counsel and is already being represented by an experienced, court-appointed criminal lawyer, it is not an abuse of discretion to deny defendant's trial-day request for a continuance.' " *People v. Staple*, 402 Ill. App. 3d 1098, 1103 (2010) (quoting *People v. Jackson*, 216 Ill. App. 3d 1, 7 (1991)).

¶ 25    Most important, a court must balance the defendant's right to counsel of his choice against the need for the efficient and effective administration of justice. *Curry*, 2013 IL App

(4th) 120724, ¶ 48. Thus, our supreme court has made clear that "a trial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel." *Segoviano*, 189 Ill. 2d at 245. Thus, if new counsel is specifically identified and stands ready, willing, and able to enter an unconditional appearance, the motion should be allowed. However, if any of those requirements is lacking, a denial of the motion is not an abuse of discretion. See *People v. Koss*, 52 Ill. App. 3d 605, 607-08 (1977).

¶ 26    *Curry* is instructive. There, the defendant was arrested on January 28, 2012, and charged with driving under the influence. Less than a month later, attorney Mark Harmon entered an appearance on the defendant's behalf. On May 23, 2012, the case was set for trial on June 11. On June 1, 2012, Harmon learned that the defendant had hired attorney Richard Frazier to represent him, and on the day of trial he filed a motion to continue the case in order to determine the nature of Frazier's relationship with the defendant. At the hearing on the motion, Harmon advised the court that the defendant wanted Frazier to represent him, that the defendant had paid Frazier a retainer, and that Frazier had conditioned his representation on Harmon's obtaining a continuance. The State objected, noting that Frazier would not enter his appearance unless the case were continued. The court denied the motion as untimely, stating, " 'we don't do motions to continue on the morning of the jury trial.' " *Curry*, 2013 IL App (4th) 120724, ¶ 15. Frazier asked if the defendant could make a statement, and the court responded that it was " 'not going to accept any *pro se* statement by a defendant who is here represented by counsel.' " *Id.* ¶ 16.

¶ 27    The defendant appealed, arguing that he was denied his right to counsel of his choice, and the Fourth District affirmed. The court stated that, when a trial court conducts an inquiry into the circumstances of a defendant's motion to substitute counsel and those circumstances demonstrate that substitute counsel does not stand ready, willing, and able to make an unconditional appearance, the court does not abuse its discretion by denying the defendant's motion. *Id.* ¶ 51. Distinguishing cases in which no inquiry at all was made into the request to substitute counsel, the court noted that the trial court did inquire into the circumstances and discovered that Frazier would not enter an appearance unless there were a continuance. *Id.* ¶¶ 50-52. At that point, the facts revealed that counsel was not ready, willing, and able to make an unconditional appearance, and the denial of the motion was not an abuse of discretion. *Id.* ¶ 52; see also *Segoviano*, 189 Ill. 2d at 245 (denial of counsel's motion to withdraw and continue for substitute counsel was not an abuse of discretion when substitute counsel had not been identified and secured).

¶ 28    Here, as in *Curry*, substitute counsel was not ready, willing, and able to enter an unconditional appearance. While Kayne said that he was willing and able to take the case, he did not appear, and he said that he could do so in two weeks. Since he was not present, he could enter an appearance only if the continuance were granted. Thus, as in *Curry*, his representation of defendant was conditioned on a continuance.

¶ 29    Defendant, citing a number of cases, argues that, despite the request for a continuance, the trial court abused its discretion by failing to make an inquiry into the reasons that he sought new counsel. In particular, he relies on *People v. Adams*, 2016 IL App (1st) 141135. There, on the day of trial, the defendant, who was represented by the public defender, requested a continuance to hire private counsel. The trial court, without inquiring into the reasons that the defendant wanted to retain private counsel, denied the request because it was

made on the day of trial and the witnesses were already there. The First District reversed, holding that, even when new counsel was not identified, reversal was warranted when the trial court failed to inquire into whether the defendant was using the request as a delay tactic. *Id.* ¶ 15. Noting that the trial court focused only on the facts that it was the day of trial and that witnesses were present, and conceding that both facts supported the court's decision, the appellate court held that the trial court's "utter failure" to make any kind of inquiry into the basis for the request outweighed those considerations. *Id.* ¶ 16. While the appellate court found that the failure to inquire by itself justified reversal, it also noted that, when the defendant made his request, the case had been pending for only 70 days, there were no previous continuances, and he had been in continuous custody.

¶ 30    We apply *Curry*. We observe that, while *Adams* cited *Segoviano*, it failed to adhere to its rule "that a trial court will not be found to abuse its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel." *Segoviano*, 189 Ill. 2d at 245. Further, unlike in *Adams* and other cases cited by defendant, the trial court here carefully considered defendant's intent. The trial court discussed the matter twice, the second time after it reviewed case law on the issue. The court specifically noted the number of previous continuances and substitutions of counsel and that defendant once failed to obtain new counsel after he was given the opportunity to do so. Defendant, through his failures to appear and tardiness, also suggested an interest in delaying the proceedings, and after his tardiness on the day of trial, the trial court suggested that this was defendant's subjective intent. To the extent that defendant would require the court to directly ask him about his intent, the case law requires an inquiry, but it does not require direct questioning of a defendant who is represented by counsel. In light of all the circumstances, the trial court did not abuse its discretion in denying the request for substitution of counsel.

¶ 31    Finally, defendant argues that the seven-year extended-term sentence for aggravated battery should be reduced to the maximum nonextended term of five years. The State agrees. When a defendant is convicted of multiple offenses that are part of a continuing course of conduct, he may be sentenced to an extended term only for those offenses that are within the most serious class. 730 ILCS 5/5-8-2(a) (West 2010); *People v. Smith*, 345 Ill. App. 3d 179, 190 (2004).

¶ 32    Here, the court sentenced defendant to an extended term for Class 3 aggravated battery (720 ILCS 5/12-3.05(h) (West 2010)), but he was also sentenced for Class X home invasion (*id.* § 12-11(c)), when the charges were based on the same course of conduct. Although defendant did not object to the extended-term sentence or include it in a posttrial motion, the erroneous imposition of an extended-term sentence is routinely reviewed as second-prong plain error. See, *e.g.*, *People v. Wilkins*, 343 Ill. App. 3d 147, 149 (2003).

¶ 33    Here, the extended-term sentence was imposed on the offense that was not within the most serious class. Thus it was error. Accordingly, pursuant to our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), we reduce defendant's sentence for aggravated battery to the maximum nonextended term of five years.

¶ 34                                   III. CONCLUSION

¶ 35    There was sufficient evidence that the laundry room was not part of the dwelling. Further, the trial court did not erroneously deprive defendant of his right to counsel of his choice. However, the extended-term sentence was imposed on the offense that was not within the

most serious class; thus we reduce the sentence for aggravated battery to the maximum nonextended term of five years. Accordingly, the judgment of the circuit court of Du Page County is affirmed as modified. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 36          Affirmed as modified.