2022 IL App (2d) 200346-U
No. 2-20-0346
Order filed January 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-140 |
| | ) | |
| LORIN VOLBERDING, | ) | Honorable |
| | ) | Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court failed to properly inquire under *Krankel* into the basis for the defendant's *pro se* claims of ineffective assistance of counsel and we remand for that inquiry. The trial court considered improper aggravating factors in sentencing, we thus vacate the defendant's sentence and remand for a new sentencing hearing.

¶ 2   Following a bench trial, the defendant, Lorin Volberding, was convicted of first-degree murder and the trial court found that the defendant personally discharged a firearm in the commission of that offense. The trial court sentenced the defendant to 25 years' imprisonment for murder with a 25-year firearm enhancement, for a total sentence of 50 years. On appeal, the defendant argues that the trial court violated his right to counsel of choice, erred in failing to

conduct a preliminary inquiry regarding the effectiveness of trial counsel (see *People v. Krankel*, 102 Ill. 2d 181 (1984)), and considered improper sentencing factors. We vacate the defendant's sentence and remand for a preliminary *Krankel* inquiry and, if necessary, a new sentencing hearing.

¶ 3                                    I. BACKGROUND

¶ 4      On February 4, 2017, the defendant was charged with the first-degree murder of his wife, Elizabeth Volberding. The defendant was subsequently indicted on two counts of first-degree murder. Count I alleged that the defendant shot his wife knowing that such act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2016)). Count II alleged that the defendant shot his wife with the intent to kill her (720 ILCS 5/9-1(a)(1) (West 2016)). Both counts included a notice that, if defendant personally discharged a firearm that proximately caused the death of another person, a term of imprisonment of 25 years to natural life would be added to the term of imprisonment imposed by the trial court. See 730 ILCS 5/5-8-(1)(d)(iii) (West 2016). The shooting occurred on February 3, 2017, in the home shared by the defendant and the victim. On the date of the offense, the defendant was 71 years old and the victim was 68 years old. They had been married for about 16 years and both had children from previous marriages. They were both retired Chicago police officers.

¶ 5      On February 7, 2017, the trial court ordered a mental health evaluation of the defendant to determine if he was fit to stand trial. A fitness evaluation was conducted by clinical psychologist Dr. Robert Meyer, who the parties stipulated was qualified to render an opinion on fitness. In a report dated March 24, 2017, Dr. Meyer concluded that, based on the defendant's condition at the time of the evaluation, the defendant was fit to stand trial. Dr. Meyer acknowledged that the defendant could not remember significant elements of the offense and that testing indicated he was not malingering. He opined that the defendant's cognitive deficits were due to his medical

problems, which included a seizure disorder, poor cardiovascular health, encephalopathy, diabetes, and a history of substance abuse. Dr. Meyer noted that, while incarcerated, "consistent medical intervention, medical management, and sustained sobriety [had] positively impacted [the defendant's] mental status and cognitive functions." Dr. Meyer opined that the defendant understood his legal situation and had sufficient mental status and cognitive functioning to assist in his defense. On April 21, 2017, following a hearing, the trial court found that, based on Dr. Meyer's report, the defendant was fit to stand trial.

¶ 6 Thereafter, the defendant's appointed counsel requested, and was granted, an order for an additional evaluation by Dr. Meyer to determine the defendant's fitness at the time of the offense. Based on Dr. Meyer's findings in this supplemental report, appointed counsel decided not to submit the report to the trial court or the State, but instead to obtain an independent expert for a second opinion.

¶ 7 On September 15, 2017, the defendant's retained counsel appeared, and appointed counsel was discharged.

¶ 8 On April 12, 2019, the defendant filed a motion for a comprehensive neuropsychological evaluation. In the motion, defense counsel indicated that, based on his interactions with the defendant, the defendant had difficulty recalling details related to the offense. The trial court granted the motion.

¶ 9 The defendant retained clinical neuropsychologist Dr. Joshua Barras to provide an opinion regarding the defendant's medical and psychological competency at the time of the offense and the defendant's fitness to stand trial. In a report dated May 28, 2019, Dr. Barras opined that the defendant was not fit for trial because he did not remember much about the incident and would not be able to assist in his defense. Dr. Barras noted that the defendant's neuropsychological

functioning was normal at the time of the evaluation. However, medical records indicated that at the time of the offense, the defendant was experiencing recurrent episodes of severe encephalopathy, characterized by confusion, agitation, and emotional lability. This condition caused memory impairment and was the reason the defendant could not remember much about the offense. Dr. Barras opined that the defendant was not malingering his lack of memory. Dr. Barras concluded that the defendant could not assist in his defense because he did not have a continuous memory of the events and circumstances surrounding the offense.

¶ 10    On June 17, 2019, the defendant filed a motion for a fitness hearing. The trial court determined that, based on Dr. Barras's report, there was a *bona fide* doubt about the defendant's fitness to stand trial. The trial court granted the State's request to procure a supplemental report from Dr. Meyer regarding the ability of the defendant to assist in his defense. In a report dated July 2, 2019, Dr. Meyer continued to maintain the opinion that the defendant was fit to stand trial. The report indicated that he had conducted another interview and additional testing of the defendant. Dr. Meyer opined that, at the time of the interview, the defendant's mental and physical conditions were stable. Dr. Meyer acknowledged that the defendant had medical conditions that resulted in amnesia as to the events surrounding the alleged offense, but stated that partial amnesia did not necessarily mean that one was unfit to stand trial. Dr. Meyer noted that the defendant understood why he was in court, was able to effectively assist in his case, and was likely to remember daily court interactions.

¶ 11    On August 26 and 27, 2019, a two-day fitness hearing was held before a jury. Drs. Meyer and Barras both testified in accord with their written reports. The jury was instructed, in part, that the "defendant is unfit if because of his mental or physical condition he is unable to understand the nature and purpose of the proceedings against him, or to assist in his defense" and that the

"inability to recollect the events of the day of the offense due to amnesia does not by itself warrant the conclusion that the defendant is unfit." Following deliberation, the jury found the defendant fit to stand trial. The defendant filed a motion for a new fitness hearing, arguing that the jury instructions were improper. The trial court denied that motion.

¶ 12 The defendant executed a jury waiver and the matter proceeded to a three-day bench trial starting on January 13, 2020. Prior to trial, when discussing the State's motion *in limine* to bar certain affirmative defenses, defense counsel confirmed that the defense was not raising any affirmative defenses.

¶ 13 At trial, the victim's neighbor, Cindy Gort, identified People's Exhibit 2, a compact disk (CD), as including a true and accurate copy of the voice message the defendant left for her on February 3, 2017. The exhibit was admitted, and the message was played for the court. In that message, the defendant stated: "I think I just shot and killed Liz," "Do what you gotta do," "I'm going to collapse," and "I couldn't handle it anymore." The defendant also stated that his back door was unlocked. Cindy Gort's husband, David Gort, identified People's Exhibit 2 as also including a true and accurate copy of the voice message the defendant left on his phone the same day. It was also admitted and played for the court. In that message, the defendant stated: "I just shot and I think I killed Liz," "she's laying in a pool of blood in the kitchen," "arrest me if you want, I can't stand it anymore," and advised that the back door was the best way to get in the house. Both of the Gorts called the police department after receiving these messages.

¶ 14 Thomas Sanders testified that he was the chief of the Spring Grove police department. On February 3, 2017, he was dispatched to the defendant's house based on 911 calls about a shooting. Sanders identified People's Exhibit 3 as a fair and accurate video depiction of the events that occurred when they entered the defendant's residence, as recorded on responding officers' body

cameras. As seen on the video, when the officers entered the home, the defendant stated that the gun was on the table. The victim was on the kitchen floor, surrounded by pooling blood, and a bullet was on the floor near her body. The defendant stated to the officers, "I shot her right in the fucking head." The defendant also stated that the victim "threw knives at [him]," and "kept egging [him] on" telling him "to shoot [her]" so he "finally fucking did." An expert in firearms identification testified that the bullet on the ground near the victim's body was fired by the gun on the kitchen table.

¶ 15    Mark Witeck, an expert in forensic pathology, conducted an autopsy on the victim's body. He concluded that a bullet had entered on the right side of her neck, passed downward through her carotid artery, damaged her spinal cord, and exited out the other side of her body. The gunshot wound to her neck caused her death. Witeck testified that there was no evidence of close-range firing, such as soot deposition or wounds from gun powder flakes striking the skin. Based on this observation, he opined that the gun barrel was two feet or more away from the victim when it was fired. Her blood alcohol content was 0.068.

¶ 16    Ellen Chapman testified as a forensic expert regarding gunshot residue (GSR), which is vapors and particulates expelled from a firearm when it is discharged. Chapman testified that a large amount of GSR will come out the muzzle of a gun when it is fired, but it also comes out the back and sides of the gun. She also testified that GSR can be found on someone who fires a gun and on someone who is fired at with the gun. After a gun is shot, there is residue on the gun itself so anyone who touches the gun could have GSR on his or her hand. Further, GSR can be removed by washing one's hands or by simply wiping them. After about six hours, any GSR on a person's hands would have fallen off on its own. Chapman tested samples, for GSR, from the back of the victim's hands, from the palm and back of each of the defendant's hands, and from the defendant's

wrist brace. The tests were negative for all the samples, except the one from the victim's left hand, which tested positive. Chapman acknowledged that she could not determine from the tests who fired a firearm. On cross-examination, Chapman testified that GSR can travel three to five feet from the back and sides of a gun but can travel 20 to 30 feet from the front of the gun. Chapman concluded that the victim either discharged a firearm, had contact with an item that had GSR on its surface, or was in the environment of a discharged weapon.

¶ 17    Susan Ellis testified that she was a McHenry County police officer and assisted in an interview of the defendant on February 3, 2017, at the McHenry County sheriff's department. She identified People's Exhibit 12 as a fair and accurate recording of the interview. The recording was admitted and played for the court. The defendant stated that the morning started out well, with he and the victim having cocktails and playing scrabble. However, they started to argue. During the argument, he retrieved a gun from their bedroom and shot the victim on the right side of her neck. He then laid with her on the floor and tried to talk to her. He crawled to a phone to call his neighbors, the Gorts. He continued to lay on the floor with her until someone arrived. During the interview, the defendant described the gun, explained how he held it when he shot the victim, and stated that he put it on the kitchen table after the shooting. The defendant also made statements such as "everybody deserves to be shot on their birthday," and that the victim was "an asshole." He stated that the victim had been throwing knives at him and encouraging him to shoot her during an argument about selling the house, "so [he] did."

¶ 18    The defendant testified on his own behalf that, on the day of the offense, he did not recall the basis for any argument with the victim, retrieving the gun from his bedroom, or bringing it to the kitchen. He remembered very little about the offense and had no recollection of being arrested or transported to the sheriff's department. His first memory was of a female officer in jail directing

him to eat or drink something because he had not done so for four days. He remembered lying on the kitchen floor the day of the incident, hearing the dog bark, and hearing someone say, "give me the dog." At the time of the offense, he was taking about 30 medications each day. He did not remember drinking alcohol on the day of the incident.

¶ 19 The defendant further testified that he only vaguely remembered his meetings with Dr. Meyer. He did not remember telling Dr. Meyer that he and the victim "were having a domestic" or that he "guess[ed] [he] went goofy and shot her." He testified that he did not remember having an argument with the victim on the day of the offense. He did remember the victim throwing knives and kitchen utensils at him. The defendant stated he was not "of sound mind" during the police interview and was "confused." He also testified he did not remember most anything, that it was not his fault, that it just happened, and that he was not sure what happened.

¶ 20 In closing argument, defense counsel asked the trial court to find the defendant unfit to stand trial. Defense counsel argued that the video showed that the defendant was confused during the police interrogation. Defense counsel further noted that both Drs. Meyer and Barras agreed that the defendant had amnesia concerning the events surrounding the offense. Defense counsel argued that, because of the amnesia, the defendant was not able to assist in his defense. He asserted that the evidence indicated that there was an argument, there was alcohol involved, and there was GSR on the victim's left hand and she was left-handed. Defense counsel did not know whether the offense was the result of intense provocation, whether the parties struggled over the gun and it accidentally discharged, or whether it was a suicide. Defense counsel argued that he could not provide a defense because the defendant could not tell him anything about the incident.

¶ 21 On January 15, 2020, following closing arguments, the trial court found the defendant guilty of two counts of first-degree murder and found that the defendant discharged a firearm that

caused the victim's death. The trial court found that the victim died from the single gunshot wound to her neck and that the defendant admitted that he had shot her in his phone calls to his neighbors and his statements to the police. The trial court found that, from watching the interrogation interview, it was clear that, on the day of the offense, the defendant had a good recall of the events that took place at his home. Specifically, the defendant was able to speak about his family and employment history with enough detail to show he had cognitive abilities in the hours after the shooting. The trial court found the assertion that the victim shot herself to be contrary to the physical evidence and to the defendant's statements. The trial court noted that, based on the defendant's police experience, the defendant's shooting at the victim's head or neck demonstrated an intent to cause great bodily harm or death.

¶ 22 The trial court addressed the defendant's renewed claim for a finding of unfitness. The trial court noted that the claim was based on the assertion that the defendant could not assist in his defense because he could not remember the events surrounding the offense. The trial court stated that, in August 2019, a jury found the defendant fit to stand trial and that there was no evidence that his mental condition had changed since that time. The trial court acknowledged that the defendant testified that he could not remember the events at issue. The trial court noted that the defendant could have testified at the fitness hearing, without that testimony being admissible at the criminal trial, and thus could have informed the jury of his alleged lack of memory. The defendant did not do so. The trial court also noted that the defendant did not advance the affirmative defense of insanity and that it therefore could not consider a verdict based on the defendant being mentally ill.

¶ 23 Finally, the trial court noted that the basis of the defendant's argument was that his inability to remember the events of the offense precluded him from raising facts that would support a lesser

included offense or a finding of second-degree murder. The trial court believed that the defendant could have advanced an argument for a lesser offense. The trial court noted that the defendant could have presented evidence as to the condition of the residence when the police arrived on the day of the offense, such as whether there were knives lying around or whether the house was in disarray. Such facts could have been used to show that there had been a domestic disturbance prior to the shooting and that the defendant acted under sudden and intense passion from serious provocation. Accordingly, the trial court concluded that there was no factual basis to revisit the issue of fitness.

¶ 24    On February 3, 2020, the defendant filed a motion for a new trial, alleging various errors at both the jury trial on fitness and the bench trial.

¶ 25    On February 27, 2020, the defendant's retained counsel filed a motion to withdraw. In the motion, defense counsel indicated that, when he met with the defendant to discuss the pre-sentence investigation, the defendant used profanities and stated that he did not think counsel did a good job on either trial, that defense counsel failed to provide him a defense, and that he felt obligated to turn the facts of the case over to the "Bar Association."

¶ 26    On April 8, 2020, at a hearing on the motion to withdraw, defense counsel stated that, when he spoke with the defendant in jail, the defendant told him that he was not satisfied with the defense of his case and that the defendant thought defense counsel failed to provide him a good defense. Defense counsel believed that the defendant would be better served during post-trial motions and at sentencing by counsel that the defendant trusted. The trial court acknowledged the defendant's frustration with the verdict but denied the motion to withdraw. Thereafter, the following colloquy ensued:

"MR. SUGDEN [Defense Counsel]: I think my position was, Judge, that he thinks a different result would come if somebody could review my post-trial motion and add to it or subtract to it, whatever he thinks is appropriate, that he would have had a different finding. He's thinking he should not have been found guilty at all.

THE COURT: I don't think we're at that juncture in the proceeding yet. We haven't gotten to a sentencing disposition. There may well be things that could transpire. It may well—depending upon what position [the defendant] takes, it may well be that the court engage in a *Krankle* [*sic*] inquiry to ascertain those types of issues, but at this juncture we are at point in the proceeding I don't believe there are any pending post-trial motions –

MR. SUGDEN: Motion for new trial was filed.

THE COURT: This court will state of record that it has obviously presided over the jury proceeding at which [the defendant] was found fit to stand trial and presided over the bench proceeding and finds at all material time [*sic*] [defense counsel] acted zealously and aggressively within the confines of his professional responsibilities to represent [the defendant]."

The trial court reiterated that the motion to withdraw was denied.

¶ 27     On June 17, 2020, following a hearing, the trial court denied the motion for a new trial and a sentencing hearing immediately followed. In aggravation, the State presented victim impact statements from the victim's two children. In mitigation, the defendant argued that the trial court should consider his lack of criminal history, 30 years of service as a police officer, as well as the role played in the commission of the offense by the defendant's alcohol consumption and mental impairment. The defendant made a statement in allocution refuting allegations by the victim's children that historically he had been abusive toward the victim.

¶ 28    The trial court stated that it considered, pursuant to section 5-5-3.2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.2 (West 2018)), the following factors in aggravation:

"The defendant's conduct caused serious harm. The sentence that will be imposed is necessary to deter others from committing the same crime. The defendant committed the offense against a person 60 years of age or older. The defendant was convicted of a felony—was convicted of a felony while he was released on bail for a prior felony and then was convicted of the prior felony."

(As to the last factor, it is unclear what the trial court was referring to. The record indicates that the defendant was never released on bail for or convicted of a prior felony.) In mitigation, the trial court stated that it considered the defendant's lack of criminal history and that he had led a law-abiding life for a substantial period of time. The trial court merged the counts of first-degree murder and imposed a 25-year prison term on that conviction. The trial court also imposed the statutory 25-year firearm enhancement, for a total prison term of 50 years. The defendant filed a timely notice of appeal and an amended notice of appeal.

¶ 29                        II. ANALYSIS

¶ 30                   A. Right to Counsel of Choice

¶ 31    The defendant's first contention on appeal is that the trial court violated his right to counsel of choice when it refused to allow defense counsel to withdraw following trial. A defendant in a criminal matter has a constitutional right to the assistance of counsel under the sixth amendment to the United States Constitution as made applicable to the states via the fourteenth amendment. U.S. Const., amends. VI, XIV; Ill. Const 1970, art. I, § 8. That right includes the right to counsel of the defendant's choice (*People v. Friedman*, 79 Ill. 2d 341, 349 (1980)), and it has been regarded as the root meaning of the constitutional guarantee in the sixth amendment (*People v. Tucker*, 382

Ill. App. 3d 916, 919 (2008) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006))).

¶ 32    Nonetheless, the right to substitute counsel is not absolute, and the trial court may deny a defendant's request to substitute counsel if the " 'substitution of counsel would unduly prejudice the other party or interfere with the administration of justice.' " *Sullivan v. Eichmann*, 213 Ill. 2d 82, 91 (2004) (quoting *Filko v. Filko*, 127 Ill. App. 2d 10, 17 (1970)).  It is well settled that a defendant's right to counsel of choice must be measured against the trial court's interest in trying the case with diligence and the orderly process of judicial administration.  *People v. Brisco*, 2012 IL App (1st) 101612, ¶ 41; *People v. Curry*, 2013 IL App (4th) 120724, ¶ 48.  In balancing these interests, " 'the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic.' " *Tucker*, 382 Ill. App. 3d at 920 (quoting *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992)).

¶ 33    We review the trial court's decision on a motion to substitute counsel for an abuse of discretion.  *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000).  A trial court does not abuse its discretion in denying a motion to substitute counsel in the absence of ready and willing substitute counsel.  *People v. Ramsey*, 2018 IL App (2d) 151071, ¶ 25.  If new counsel is specifically identified and is ready, willing, and able to enter an unconditional appearance, the trial court should grant the motion.  *Id.*  However, if any of those requirements are lacking, the denial of a motion to substitute counsel is not an abuse of discretion.  *Id.*  Where, as here, there are no disputes of fact, whether a defendant's right to counsel has been violated is an issue of law that we review *de novo*.  See *People v. Probst*, 344 Ill. App. 3d 378, 382 (2003).

¶ 34    In the present case, the defendant is arguing that defense counsel's motion to withdraw was essentially a motion for substitute counsel.  We will assume this assertion is correct for the purpose

of this argument. Although the defendant has a right to counsel of choice, it is also well settled that the right has limitations. Specifically, if new counsel is not identified and ready, willing, and able to enter an unconditional appearance, the denial of a motion to substitute counsel is not an abuse of discretion. Here, the record demonstrates that the defendant had not identified any substitute counsel that was ready, willing, and able to enter an unconditional appearance. Under these circumstances, the trial court did not abuse its discretion in denying the motion. *Ramsey*, 2018 IL App (2d) 151071, ¶ 25.

¶ 35    The defendant relies on *People v. Bingham*, 364 Ill. App. 3d 642 (2006), and *People v. Washington*, 195 Ill. App. 3d 520 (1990), in arguing that the trial court violated his right to counsel. In both of those cases, the defendants, represented by appointed counsel, requested continuances so that they could proceed with retained counsel. *Bingham*, 364 Ill. App. 3d at 644; *Washington*, 195 Ill. App. 3d at 522. In *Bingham*, retained counsel represented the defendant on other matters and had contacted the State the previous day. *Bingham*, 364 Ill. App. 3d at 644. In *Washington*, the defendant's family retained an attorney, and the attorney requested a 7-day continuance. *Washington*, 195 Ill. App. 3d at 522. In both cases, the trial court denied the request for continuance, and those rulings were reversed on appeal. *Bingham*, 364 Ill. App. 3d at 644-45; *Washington*, 195 Ill. App. 3d at 522, 527. The reviewing courts held that the trial courts had erred in not inquiring further into the requests for substitute counsel to determine whether the requests were mere delay tactics. *Bingham*, 364 Ill. App. 3d at 645; *Washington*, 195 Ill. App. 3d at 526.

¶ 36    The defendant's reliance on these cases is unpersuasive. In *Bingham* and *Washington*, appointed defense counsel specifically moved for substitution of counsel. Further, in *Bingham*, a named attorney was already representing the *Bingham* defendant on other matters and wanted to represent the *Bingham* defendant in that case. In *Washington*, the *Washington* defendant's family

had hired an attorney that stated he would be ready for trial in seven days. In the present case, defense counsel filed a motion to withdraw, not a motion for substitute counsel. More importantly, however, unlike in *Bingham* and *Washington*, there was no indication that the defendant had alternate counsel that was ready, willing, and able to proceed. No alternate attorney was named and there was no indication that another attorney had already been retained.

¶ 37 The defendant argues that, had the trial court inquired further, he would have requested the appointment of a public defender. In that case, the defendant asserts that the failure to have substitute counsel ready, willing, and able to proceed, would not have been a proper basis to deny his motion. In so arguing, the defendant relies on *People v. Abernathy*, 399 Ill. App. 3d 420, 426-32 (2010). In that case, the defendant, Raymond Abernathy, following his trial and conviction but prior to post-trial proceedings, specifically stated to the trial court that he wanted to hire a new attorney. *Id.* at 422. Later, when Abernathy realized that his family could not afford to hire a new attorney, he repeatedly requested the appointment of a public defender. *Id.* at 423-24. The trial court denied Abernathy's motion to discharge his attorney and hire a new one. *Id.* at 425. On appeal, the reviewing court held that the trial court erred in failing to allow Abernathy the opportunity to show he was indigent and, if so, appoint new counsel. *Id.* at 431.

¶ 38 The present case is distinguishable from *Abernathy*. Here, defense counsel filed a motion to withdraw of his own accord. The defendant himself never expressed a desire to hire a new attorney or made such a request to the trial court. The defendant argues that the trial court erred in not inquiring into whether the defendant wanted to hire new private counsel or seek the appointment of a public defender. However, when presenting his motion to withdraw, defense counsel stated only that he believed the defendant would be better served posttrial by an attorney the defendant trusted. As stated, there was no indication from the defendant that he wanted a new

attorney or the appointment of a public defender. Further, after the trial court denied the motion to withdraw, the issue was never raised again. The defendant did not repeatedly request the appointment of a public defender as in *Abernathy*. Under these circumstances, the defendant's contention that he was denied the right to counsel of choice is without merit.

¶ 39                                        B. *Krankel* Inquiry

¶ 40    The defendant's next contention on appeal is that, when his attorney filed a motion to withdraw based on the defendant's dissatisfaction with his representation, the trial court erred in failing to conduct a preliminary *Krankel* inquiry as to whether the defendant was denied the effective assistance of counsel. *Krankel*, 102 Ill. 2d at 189 (establishing a procedure for trial courts to follow when a defendant makes *pro se* posttrial claims of ineffective assistance).

¶ 41    The State argues that a *Krankel* inquiry is required only when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel and that a motion to withdraw is not sufficient to raise a *Krankel* issue. The State further argues that, to the extent defense counsel's comments could be considered as a claim of ineffective assistance, the comments were speculative, vague, and conclusory. As there was no indication what other defenses the defendant believed could have been raised, the State contends that defense counsel's statements were not sufficient to trigger *Krankel*.

¶ 42    When a defendant brings a *pro se* posttrial claim that trial counsel was ineffective, *Krankel* requires the trial court to inquire into the factual basis of the claim and, under certain circumstances, to appoint new counsel to argue the claim. *People v. Ayres*, 2017 IL 120071, ¶ 11; *People v. Remsik-Miller*, 2012 IL App (2d) 100921, ¶ 9. New counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial claim alleging ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, the court should first

examine the factual basis of the defendant's claim. *Id.* at 77-78. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court may deny the *pro se* motion. *Id.* at 78. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id.* If a trial court "fails to conduct the necessary preliminary examination as to the factual basis of the defendant's allegations, the case must be remanded for the limited purpose of allowing the court to do so." *Remsik-Miller*, 2012 IL App (2d) 100921, ¶ 9.

¶ 43 To trigger the trial court's duty to inquire, " '[a] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention' " *Ayres*, 2017 IL 120071, ¶ 11 (quoting *Moore*, 207 Ill. 2d at 79). "[T]hus, a defendant is not required to file a written motion [citation] but may raise the issue orally [citation] or through a letter or note to the court [citation]." *Id.* Further, a *pro se* defendant need not allege the underlying factual basis for his claim. *People v. Bates*, 2019 IL 124143, ¶ 15. While the mere words "ineffective assistance of counsel" are sufficient to trigger *Krankel* (*id.*), those words are not required. Rather, it is sufficient if the substance of the defendant's statements raise a claim of ineffective assistance of counsel. *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 37 (explaining that requiring the words "ineffective assistance of counsel" would be elevating form over substance). The threshold question of whether a defendant's statement constituted a *pro se* claim of ineffective assistance sufficient to trigger the trial court's duty to inquire into the factual basis of the claim is a question of law; thus, our review is *de novo*. See *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 44 In the present case, the issue is whether defense counsel's statements in the motion to withdraw, and his statements at the hearing on the motion, were sufficient to trigger the requirement of a *Krankel* inquiry. In deciding this issue, *People v. Downing*, 2019 IL App (1st) 170329, and *People v. Craig*, 2020 IL App (2d) 170679, are instructive.

¶ 45    In *Downing*, at issue was whether a defendant's statements, included in a presentence investigation (PSI) report and brought to the trial court's attention, were sufficient to trigger a *Krankel* inquiry. During a PSI interview, the defendant, Alfred Downing, complained about his attorney's trial performance. *Downing*, 2019 IL App (1st) 170329, ¶ 1. Downing stated that his attorney failed to call three witnesses; that he wanted to replace defense counsel; and that counsel did not let him testify in his own defense. *Id.* ¶ 17. These statements were brought to the trial court's attention at Downing's sentencing hearing, when the State argued, as an aggravating factor, that the complaints about defense counsel in the PSI report showed that Downing lacked remorse for his crimes. *Id.* ¶ 1.

¶ 46    The *Downing* court noted that the defendant's statements in the PSI report were clearly sufficient to trigger *Krankel* and that the real issue was whether the manner in which the comments were received (a PSI report), and by whom they were delivered (the State), was sufficient to trigger *Krankel*. *Id.* ¶ 18. In answering this question, the *Downing* court noted that the purpose of *Krankel* was to " 'promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal.' " *Id.* ¶ 36 (quoting *People v. Patrick*, 2011 IL 111666, ¶ 41). The *Downing* court further noted that the goal of *Krankel* was accuracy and efficiency (*id.* ¶ 40), and that courts should not "kick the can down the road" (*id.* ¶ 41). Accordingly, the *Downing* court concluded that a *Krankel* inquiry was required "whenever a defendant's post-trial allegations of attorney incompetence have been brought to the trial court's attention in open court." *Id.* ¶ 40. The *Downing* court stressed that its holding was "limited to the situation where allegations of ineffectiveness came, albeit indirectly, from the defendant's mouth," as opposed to a situation where a defense attorney alleges his own ineffectiveness. *Id.* ¶ 45.

¶ 47   In *Craig*, the defendant was convicted on charges involving the sexual assault and abuse of his nieces and nephews. *Craig*, 2020 IL App (2d) 170679, ¶¶ 3-4. The PSI report indicated as follows:

> " '[Defendant] stated that his lawyer did not have his niece or his mother come to court to testify on his behalf. He stated that his niece was taking care of these kids (his brother's children) and he was never at his niece's house and the kids told the niece that [defendant] never did anything.' " *Id.* ¶ 8.

At sentencing, the trial court stated that it considered the PSI report. *Id.*

¶ 48   On appeal, the *Craig* defendant argued that the trial court erred in failing to conduct a preliminary *Krankel* inquiry prior to sentencing him. *Id.* ¶ 11. This court concluded that the statements in the PSI were sufficient to trigger a *Krankel* inquiry. This court noted that the statements in the PSI clearly implied that counsel was ineffective for failing to call the defendant's niece to testify. *Id.* ¶ 17. Further, this court concluded that the claim was properly presented by the defendant to the trial court for purposes of *Krankel*, noting that the statements were those of the defendant and the record indicated that the trial court read the PSI. *Id.* ¶ 18.

¶ 49   In the present case, the defendant told defense counsel that defense counsel did not do a good job and that he failed to provide a defense. These comments were brought to the trial court's attention in the written motion to withdraw and orally at the hearing on the motion to withdraw. As in *Downing*, the defendant's statements were brought to the trial court's attention in open court and, as in *Craig*, the statements were those of the defendant and clearly implied that counsel was ineffective. Accordingly, we hold that the statements were sufficient to trigger *Krankel* and that the trial court erred in failing to conduct a preliminary inquiry.

¶ 50     The State argues that a motion to withdraw is not sufficient to raise a *Krankel* issue.  This argument is without merit.  In *People v. Jackson*, 243 Ill. App. 3d 1026, 1033-34 (1993), prior to a hearing on the defendant's posttrial motion, defense counsel moved to withdraw.  At a hearing, defense counsel informed the trial court that the motion to withdraw was based on the defendant filing an ARDC complaint, which included allegations of ineffectiveness.  *Id.* at 1034.  The trial court denied the motion to withdraw.  *Id.* at 1035.  On appeal, the reviewing court held that the trial court erred in failing to conduct a preliminary inquiry about the allegations of ineffectiveness before denying the motion to withdraw.  *Id.* at 1036.  Accordingly, as in *Jackson*, a motion to withdraw is sufficient to trigger a *Krankel* inquiry.

¶ 51                              C. Sentencing Errors

¶ 52     The defendant's final contention on appeal is that he is entitled to a new sentencing hearing because the trial court considered improper aggravating factors.  First, the defendant argues that the trial court improperly considered a factor inherent in the offense, namely, that his conduct caused serious harm, as an aggravating factor.  Second, he argues that the trial court wrongly considered that he was "convicted of a felony while he was released on bail for a prior felony and then was convicted of the prior felony."  The defendant asserts this factor was improper because it simply did not apply based on the evidence before the court.

¶ 53     At the outset, the defendant concedes that he failed to raise this issue at the sentencing hearing or in a motion to reconsider sentence.  Nevertheless, he argues that the issue may be reviewed under the plain-error doctrine.  In the sentencing context, unpreserved errors may be reviewed if (1) the evidence at sentencing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing.  *People v. Walsh*, 2016 IL App (2d) 140357,

¶ 17. The first inquiry under plain-error review is to determine whether error actually occurred. *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 11.

¶ 54 "It is well settled that the trial court has broad discretionary powers in imposing a sentence, and the trial court's sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A trial court has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense, so long as it does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors. *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990).

¶ 55 A factor implicit in the offense may not be considered as an aggravating factor in sentencing. *People v. Dowding*, 388 Ill. App. 3d 936, 942 (2009). The rationale is that the legislature has already considered the factors inherent in the offense when setting a range of penalties, and it would be improper to consider those factors again as a reason for imposing a greater penalty. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9 (noting that the dual use of a single factor is often referred to as a "double enhancement"). Nonetheless, reliance on an improper aggravating factor does not necessarily require remand where the weight placed on the improper factor is so insignificant that it did not lead to a greater sentence. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983).

¶ 56 There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning. *Dowding*, 388 Ill. App. 3d at 942-43. In deciding whether the trial court's sentence was based on proper aggravating and mitigating factors, a reviewing court must consider the record as a whole, rather than focusing on a few words or statements by the trial court. *Id.* at 943. The question of whether a court relied on an improper factor in imposing a sentence is a question of law that this court reviews *de novo*. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 57    In the present case, the trial court specifically stated that it was considering, as statutory aggravating factors, that the defendant's conduct caused serious harm and that the defendant was "convicted of a felony while he was released on bail for a prior felony and then was convicted of the prior felony." The trial court's consideration that the offense caused serious harm, as an aggravating factor, was an improper double enhancement. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. Further, the record does not support that the defendant was convicted of a prior felony and, thus, the consideration of that as an aggravating factor was also improper.

¶ 58    The State argues that the trial court is presumed to base its sentencing determination on proper legal reasoning. The State contends that when the trial court stated it considered that the defendant's conduct caused serious harm, it was referring to the nature and circumstances of the offense. However, there is nothing in the record to support this assertion. The trial court did not discuss this factor while elaborating on the nature and circumstances of the crime. Rather, the trial court specifically stated that it was considering that the defendant's conduct caused serious harm as a statutory factor in aggravation.

¶ 59    The State also argues that, when mentioning a prior felony, the trial court was likely referring to the fact that, while in custody, the defendant was charged with aggravated battery of a corrections officer. The State notes that the charge was still pending at the conclusion of the present case, but that it was *nolle prossed* after the defendant was convicted and sentenced in this case. The State asserts that it was not improper for the trial court to consider the pending charge. Regardless of whether the trial court could have considered the pending charge, there was nothing in the record to support the trial court's consideration of a nonexistent prior felony conviction as an aggravating factor.

¶ 60    Having determined that the trial court considered improper factors in aggravation, the next inquiry is whether a remand is required. When a trial court considers an improper factor in aggravation, we must remand the case unless it appears from the record that the weight placed upon the improper factor was so insignificant that it did not lead to a greater sentence. *Dowding*, 388 Ill. App. 3d at 945. "Courts of review have found the following considerations to be helpful in determining whether trial courts have afforded significant weight to improper factors such that remand would be required: (1) whether the trial court made any dismissive or emphatic comments in reciting its consideration of the improper factor; and (2) whether the sentence received was substantially less than the maximum." *Id.*

¶ 61    The State argues that a remand is not required because the record shows that the weight placed on the improper factors was insignificant. As to the nonexistent prior felony conviction, the State argues that remand is not required because the trial court also found, in mitigation, that the defendant had no prior criminal history. Regarding the consideration that the defendant's conduct caused serious harm, the State notes that the trial court considered two proper aggravating factors, the need to deter others and that the victim was over the age of 60, and still sentenced the defendant to only five years above the minimum. The State asserts that this demonstrates that the defendant's sentence was not impacted by the improper aggravating factors.

¶ 62    *Abdelhadi* is instructive in determining whether a remand is necessary. In that case, the trial court considered an improper factor in sentencing. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 12. In determining that a remand was necessary, this court noted that although the sentence was substantially below the maximum sentence, it was also four years above the minimum sentence and "thus [did] not allow [this court] to discern how much weight the trial court placed on that factor." *Id.* ¶ 19. This court also noted that the trial court's brief comments did not demonstrate

how much weight the trial court placed on the improper factor. *Id.* Thus, we remanded the case for a new sentencing hearing. *Id.*

¶ 63    The State argues that *Abdelhadi* is distinguishable because, in that case, the improper factor relied on by the trial court was a factor that the State argued should be considered in aggravation. In the present case, in contrast, the State did not argue that the trial court should consider in aggravation the improper factors at issue. This argument misses the mark. In *Abdelhadi*, the fact that the trial court's consideration of the improper factor mirrored the State's argument, was considered by this court in first holding that the trial court actually considered the factor at issue as a factor in aggravation. *Id.* ¶ 12. In finding that remand was necessary, the *Abdelhadi* court mentioned only that it was impossible to discern from the record how much weight was placed on the improper factor. *Id.* ¶ 19.

¶ 64    In the present case, the trial court specifically stated that it was considering the factors at issue as factors in aggravation. As in *Abdelhadi*, the record does not show how much weight the trial court placed on the improper factors. Therefore, we must vacate the defendant's sentence and remand the case for a new sentencing hearing. In this respect, we note that the defendant has established plain error under the second prong of the plain-error doctrine. See *People v. Martin*, 119 Ill. 2d 453, 458 (1988) (the consideration of an improper aggravating factor in sentencing "clearly affect[s] the defendant's fundamental right to liberty"); see also *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 17 (consideration of improper aggravating factor constituted second-prong plain error).

¶ 65    Since we are vacating the defendant's sentence on this basis, we need not consider the defendant's remaining argument regarding ineffective assistance of counsel in failing to object at sentencing to the consideration of the improper factors or raise the issue in a posttrial motion.

¶ 66                                          III. CONCLUSION

¶ 67    For the reasons stated, the circuit court of McHenry County erred in failing to inquire into the underlying factual basis of the defendant's allegation of ineffective assistance and in considering improper aggravating factors in sentencing.  We vacate the defendant's sentence and remand the case for an initial *Krankel* inquiry and, if necessary, a new sentencing hearing.

¶ 68    Specifically, if, after the preliminary inquiry, the trial court determines that the defendant's *pro se* claims of ineffective assistance of counsel lack merit or pertain only to matters of trial strategy, then it need not appoint new counsel and may deny the *pro se* motion.  The trial court can then conduct a new sentencing hearing.

¶ 69    However, if the allegations show possible neglect of the case, then the trial court should set the matter for a proper second stage *Krankel* hearing, where the defendant can proceed with either appointed or retained counsel.  See *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 43 (outlining the *Krankel* process).  The new attorney shall investigate the defendant's claims of ineffective assistance of trial counsel and present any nonfrivolous claims supported by the record or by his or her independent investigation; the trial court shall then hold an appropriate adversarial second stage *Krankel* hearing on those claims.  If the new attorney finds no such claims, he or she should move to withdraw following the procedure explained in *Downs*.  See *id.* ¶ 51 (setting forth the procedure for *Krankel* counsel to withdraw).  If, after appropriate second stage *Krankel* proceedings, the trial court determines that the claims either lack merit or caused no prejudice, then the trial court should conduct a new sentencing hearing.  However, if the defendant's claims of ineffective assistance of trial counsel have merit, and a new trial is warranted, then the sentencing error raised in this appeal becomes moot.

¶ 70    Vacated and remanded with instructions.